UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
_____ DIVISION

CASE NO.

CROSSCHECK, LLC

          Plaintiff,

vs.

TAPNSELL, INC., and CARLOS GARCIA,

          Defendants.
_____/

## COMPLAINT

Plaintiff Crosscheck, LLC ("Crosscheck") sues Defendants TapNSell, Inc. ("TapNSell") and Carlos Garcia ("Garcia"), and alleges:

### PARTIES, JURISDICTION, AND VENUE

1. This is an action for rescission of a sale of securities by Defendant TapNSell to Plaintiff, for return of the consideration paid for the securities, for control party liability against Defendant Garcia, for injunctive relief, and for imposition of a constructive trust.

2. This Court has Federal Question jurisdiction under §17(a) of the Securities Act of 1933, 15 U.S.C.§77 l (2) and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5.

3. Plaintiff Crosscheck is a Nevada Limited Liability Company.

4. Defendant TapNSell is a Delaware Corporation with offices in the State of Florida.

5. Defendant Garcia is a resident of the State of Florida, and is a control person of TapNSell within the meaning of §20 of the Securities Act of 1933, 15 U.S.C. §77o.

6.Venue is proper in this Court, as the Parties have contractually agreed that any actions between them "arising in whole and in part under or in connection with [the Stock Purchase Agreement]," shall be brought in Miami Dade County, Florida. (Stock Purchase Agreement dated June 23, 2015; **Exhibit A**).

7.All conditions precedent to the filing of this Action have occurred or been waived.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

8.TapNSell is a start-up company controlled by Garcia, which purportedly is developing a patented technology that allows users to post "garage sales" of items on a smart phone application, and to transact sales of such items via smart phone.

9.TapNSell's stated plan is to develop its product and seek investor financing to develop and grow the business.

10.In May, 2015 Garcia, on behalf of TapNSell, approached Scott Richter, an investor, and offered to sell him shares in the company as part of an initial $1 million "seed financing," that would enable the Company to continue its efforts to develop and launch the product while seeking $10 million in venture capital financing. Garcia told Richter that TapNSell owned unique technologies that would enable posting of items for sale, closing a sale of the item, and managing payment for and delivery of the item. Garcia further represented that TapNSell had patents pending on the unique technologies.

11.Garcia further represented that TapNSell had already developed an android version of the product which had over 2,000 active users. Garcia represented that the user base had been growing over 1,000% per month, and that by August the base would be 70,000.

12.Garcia represented that his plan for TapNSell was to raise an initial $1 million in financing and then raise an additional $10 million from venture capitalists. Garcia represented

to Richter that he and his wife had already invested $500,000 of the $1 million initial seed financing being raised, and that another investor had purchased stock for $100,000. Garcia proposed that Richter provide an additional $400,000 for the purpose of funding further development of the product while the Company made presentations to venture capitalists to raise the additional $10 million. As part of his sales pitch to Richter, Garcia also provided a written budget showing the proposed use of the seed financing over the next several months. (**Exhibit B**). The budget reflected, and Garcia confirmed in writing, that he and his wife collectively were earning $8,000 per month in salary to operate the business. (**Exhibit B; Exhibit C**).

13. In reliance upon Garcia's representations to Richter, on June 23, 2015 Richter caused CrossCheck to enter into a Stock Purchase Agreement (**Exhibit A**) and an Advisor Agreement (**Exhibit D**).

14. The Stock Purchase Agreement provided that TapNSell would issue 787 shares of common stock in return for payment by Crosscheck of $400,000. (**Exhibit A** at ¶1). The Advisory Agreement provided that, in return for Crosscheck's services as an advisor to TapNSell, Crosscheck would be issued an additional 191 shares of TapNSell's common stock. (**Exhibit D**).

15. On June 30, 2015, Crosscheck wire transferred $400,000 to TapNSell, and was issued the shares of common stock called for in the Stock Purchase and Advisory Agreements.

16. After the investment, in September, 2015 Crosscheck was given a schedule showing the actual expenses of TapNSell from the date of Crosscheck's investment, and learned that Garcia's factual representations were false. First, it learned that $1 million in seed funds had not been raised, and that, contrary to Garcia's representation that he had invested $500,000

of his family's funds into the Company, it did not appear that Garcia had invested any capital at all. Rather, Crosscheck was the only investor, and its funds were being used for operations.

17. The schedule further reflected that representations made to Crosscheck as to how the seed financing was to be used were also false. For example, Crosscheck learned that Garcia and his wife had paid themselves monthly compensation of $15,000 rather than $8,000, and had paid higher amounts for travel and fundraising efforts, legal expenses and product development.

18. The disclosed information also reflected other serious discrepancies. For example, although $7500 per month had been paid to an undisclosed "media team" to purchase advertising, the dollar amount of advertising actually purchased was much less. Despite Garcia's representation that TapNSell's user base had increased to 70,000, there had only been 18 sales and no indication of any revenue.

19. After learning that the falsity of the representations made to induce Crosscheck's investment, Crosscheck requested that TapNSell and Garcia make full disclosure of all sources of funds raised in the purported $1 million seed financing, and provide proof that Garcia had actually invested $500,000 as represented. Garcia and TapNSell agreed to provide the information, but asked for time to compile bank statements reflecting Garcia's investment. They also attempted to explain why TapNSell had paid Garcia and his wife almost double what had been represented as being their salary.

20. After repeated requests for the bank statements, however, Garcia changed course and declined to produce any bank records. Instead, he produced wire transfer records showing that he had purchased media advertising for an unrelated company.

21. Crosscheck therefore became more concerned that Garcia had lied about having invested $500,000, and that Crosscheck had been fraudulently induced to purchase the

securities. It investigated whether TapNSell had filed any patent applications, and learned that only one application had been filed in the name of Garcia, and not the Company.

22. Crosscheck therefore became concerned that its funds were being dissipated or misappropriated by Garcia. Therefore, Crosscheck demanded that TapNSell rescind the sale, and return all remaining funds. Through counsel, TapNSell refused to do so.

23. Through counsel, TapNSell implored Crosscheck not to pursue rescission, and to be patient while it sought other investors to provide a means of repaying Crosscheck's funds. This indicated an intention to continue its fraudulent fundraising tactics.

## COUNT I

**(Violation of Section 17(a) of the Securities Act of 1933 and Rule 10b-5)**

24. Plaintiff realleges paragraphs 1 through 23 herein.

25. Defendants TapNSell and Garcia intentionally made the following false representations of material fact: (i) TapNSell was in the process of raising $1 million in initial seed financing prior to seeking an initial round of financing of $10 million; (ii) Crosscheck's $400,000 investment would be part of the initial $1 million funding; (iii) Garcia and his wife had already invested $500,000 of the $1 million, (iv) the initial financing would be used for particular purposes as reflected in a written budget, (v) Garcia and his wife would only pay themselves minimal salaries in the collective amount of $8,000 monthly (vi) TapNSell had filed several patent applications for the technologies to be used; and (vii) TapNSell's user base had been growing by 1000% each month.

26. Defendants made the false representations of material fact with the intention of inducing Crosscheck into purchasing shares of common stock in TapNSell.

27. In reliance upon the truth of Defendants' representations, Plaintiff purchased shares of common stock for $400,000.

28. Defendants' representations constituted a device, scheme or artifice to defraud, and constituted untrue statements of material fact, or omissions of material facts necessary on order to make the statements not misleading. Defendants engaged in acts, practices and course of business which operated as a fraud or deceit upon Crosscheck. For these reasons, Defendants have violated Section 17 (a) of the Securities Act of 1933 and Rule 10b-5 promulgated thereunder.

29. Plaintiff is entitled to rescission of the Stock Purchase Agreement, and a return of all of the consideration paid for the sale, plus interest since the date of investment.

30. Plaintiff has offered to return the shares of common stock that it was fraudulently induced to purchase, and remains ready and able to do so.

31. Upon information and belief, a portion of the funds paid for the stock remain segregated in a bank account controlled by TapNSell and/or Garcia. Absent imposition of a constructive trust over such funds, Defendants are likely to dissipate or misappropriate them.

WHEREFORE, Plaintiff demands judgment (i) rescinding the Stock Purchase Agreement and the Advisory Agreement, (ii) returning all consideration paid for the purchase of the stock, plus interest since the date of investment, (iii) imposition of a constructive trust over all proceeds of the sale that remain within the control of Defendants, or either of them, and (iv) granting such further relief as the Court deems just and proper.

## COUNT II

### (Control Person Liability)

32. Plaintiff realleges paragraphs 1 through 23, and 24 through 31 herein.

33. Defendant Garcia is a control person of Defendant TapNSell within the meaning of Section 20 of the Securities Act of 1933.

34. As control person, Garcia is jointly and severally liable with TapNSell for return of the consideration paid by Crosscheck for the stock.

WHEREFORE, Plaintiff demands judgment against Garcia for (i) all consideration paid by Crosscheck for the stock, plus interest since the date of the investment, and (ii) for such other relief as the Court deems just and proper.

## COUNT III

### (Injunction)

35. Plaintiff realleges paragraphs 1 through 23, 24 through 28 and 32 through 34 herein.

36. Crosscheck has a clear right to rescission, and to a return of all consideration paid for the stock.

37. Upon information and belief, a portion of the funds paid for the stock remain in a segregated bank account, which constitutes a *res* over which a constructive trust may be imposed.

38. Absent an injunction, there is a clear danger that Defendants may dissipate or misappropriate the funds. Such dissipation or misappropriation would irreparably harm Crosscheck, as Defendants have stated that they do not have the capital to return the consideration, and will need to raise more funds from new investors to do so. If Plaintiff accepts

funds that have been fraudulently procured from others, they may be subject to litigation from third parties, and will have no recourse against the insolvent perpetrators of the fraud.

39.     Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment imposing a temporary and permanent injunction against further use, dissipation or misappropriation of the consideration paid by Crosscheck for the stock.

Date: November 12, 2015                             Respectfully submitted,

                                                                     **LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**
*Counsel for Plaintiff*
201 S. Biscayne Blvd., 22nd Floor
Miami, Florida  33131-4301
(305) 403-8788 Main
(305) 403-8789 Facsimile

By: */s/ Lawrence A. Kellogg, P.A.*
    LAWRENCE A. KELLOGG, P.A.
    Florida Bar No. 328601
    Primary E-Mail: lak@lklsg.com
    Secondary E-Mail: cod@lklsg.com

IN7149

8
LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789